

FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

2021 AUG 26 P 12: 29

KOH
CLERK'S OFFICE
AT
BY

**U.S. Department of Justice**

*United States Attorney*
*District of Maryland*
*Southern Division*

Jennifer L. Wine
Assistant United States Attorney
Jennifer.Wine@usdoj.gov

Mailing Address
6500 Cherrywood Lane, Suite 200
Greenbelt, Maryland

Office Location
6406 Ivy Lane, 8th Floor
Greenbelt, Maryland

DIRECT 301-344-4124
MAIN 301-344-4433
FAX 301-344-4516

August 24, 2021

John McKenna, Esq.
Brennan McKenna Mitchell & Shay, Chtd.
6305 Ivy Lane, Suite 700
Greenbelt, Maryland 20770

    Re:    United States v. Rodney Jerrod Jefferson,
                Criminal No. TDC-20-276

Dear Counsel:

    This letter, together with the Sealed Supplement, confirms the plea agreement (this "Agreement") that has been offered to your client, Rodney Jerrod Jefferson (hereinafter "Defendant"), by the United States Attorney's Office for the District of Maryland ("this Office"). If the Defendant accepts this offer, please have the Defendant execute it in the spaces provided below. If this offer has not been accepted by **2:00 p.m. on August 25, 2021**, it will be deemed withdrawn. The terms of the Agreement are as follows:

### Offenses of Conviction

    1.    The Defendant agrees to plead guilty to Count One of the Indictment, which charges the Defendant with conspiracy to commit bank fraud, in violation of 18 U.S.C. § 1349. The Defendant admits that the Defendant is, in fact, guilty of the offense and will so advise the Court.

### Elements of the Offense

    2.    The elements of the offense to which the Defendant has agreed to plead guilty, and which this Office would prove if the case went to trial, are as follows: That on or about the time alleged in the Indictment, in the District of Maryland—(1) the Defendant and at least one other person entered the unlawful agreement charged in the Indictment, that is, conspiracy to commit bank fraud; and (2) the Defendant knowingly and willfully became a member of that conspiracy.

### Penalties

    3.    The maximum penalties provided by statute for the offense to which the Defendant is pleading guilty are as follows:

Rev. August 2018

| Count | Statute | Minimum Prison | Maximum Prison | Supervised Release | Maximum Fine | Special Assessment |
|---|---|---|---|---|---|---|
| 1 | 18 U.S.C. § 1349 | N/A | 30 years | 5 years | $1,000,000 | $100 |

  a. Prison: If the Court orders a term of imprisonment, the Bureau of Prisons has sole discretion to designate the institution at which it will be served.

  b. Supervised Release: If the Court orders a term of supervised release, and the Defendant violates the conditions of supervised release, the Court may order the Defendant returned to custody to serve a term of imprisonment as permitted by statute, followed by an additional term of supervised release.

  c. Restitution: The Court may order the Defendant to pay restitution pursuant to 18 U.S.C. §§ 3663, 3663A, and 3664.

  d. Payment: If a fine or restitution is imposed, it shall be payable immediately, unless the Court orders otherwise under 18 U.S.C. § 3572(d). The Defendant may be required to pay interest if the fine is not paid when due.

  e. Forfeiture: The Court may enter an order of forfeiture of assets directly traceable to the offense, substitute assets, and/or a money judgment equal to the value of the property subject to forfeiture.

  f. Collection of Debts: If the Court imposes a fine or restitution, this Office's Financial Litigation Unit will be responsible for collecting the debt. If the Court establishes a schedule of payments, the Defendant agrees that: (1) the full amount of the fine or restitution is nonetheless due and owing immediately; (2) the schedule of payments is merely a minimum schedule of payments and not the only method, nor a limitation on the methods, available to the United States to enforce the judgment; and (3) the United States may fully employ all powers to collect on the total amount of the debt as provided by law. Until the debt is paid, the Defendant agrees to disclose all assets in which the Defendant has any interest or over which the Defendant exercises direct or indirect control. Until the money judgment is satisfied, the Defendant authorizes this Office to obtain a credit report in order to evaluate the Defendant's ability to pay, and to request and review the Defendant's federal and state income tax returns. The Defendant agrees to complete and sign a copy of IRS Form 8821 (relating to the voluntary disclosure of federal tax return information) and a financial statement in a form provided by this Office.

<u>Waiver of Rights</u>

  4. The Defendant understands that by entering into this Agreement, the Defendant surrenders certain rights as outlined below:

a. If the Defendant had pled not guilty and persisted in that plea, the Defendant would have had the right to a speedy jury trial with the close assistance of competent counsel. That trial could be conducted by a judge, without a jury, if the Defendant, this Office, and the Court all agreed.

b. If the Defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community. Counsel and the Defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily. All twelve jurors would have to agree unanimously before the Defendant could be found guilty of any count. The jury would be instructed that the Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt

c. If the Defendant went to trial, the Government would have the burden of proving the Defendant guilty beyond a reasonable doubt. The Defendant would have the right to confront and cross-examine the Government's witnesses. The Defendant would not have to present any defense witnesses or evidence whatsoever. If the Defendant wanted to call witnesses in defense, however, the Defendant would have the subpoena power of the Court to compel the witnesses to attend.

d. The Defendant would have the right to testify in the Defendant's own defense if the Defendant so chose, and the Defendant would have the right to refuse to testify. If the Defendant chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from the Defendant's decision not to testify.

e. If the Defendant were found guilty after a trial, the Defendant would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed which would require a new trial or dismissal of the charges. By pleading guilty, the Defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

f. By pleading guilty, the Defendant will be giving up all of these rights, except the right, under the limited circumstances set forth in the "Waiver of Appeal" paragraph below, to appeal the sentence. By pleading guilty, the Defendant understands that the Defendant may have to answer the Court's questions both about the rights being given up and about the facts of the case. Any statements that the Defendant makes during such a hearing would not be admissible against the Defendant during a trial except in a criminal proceeding for perjury or false statement.

g. If the Court accepts the Defendant's plea of guilty, the Defendant will be giving up the right to file and have the Court rule on pretrial motions, and there will be no further trial or proceeding of any kind in the above-referenced criminal case, and the Court will find the Defendant guilty.

h. By pleading guilty, the Defendant will also be giving up certain valuable civil rights and may be subject to deportation or other loss of immigration status, including possible

denaturalization. The Defendant recognizes that if the Defendant is not a citizen of the United States, or is a naturalized citizen, pleading guilty may have consequences with respect to the Defendant's immigration status. Under federal law, conviction for a broad range of crimes can lead to adverse immigration consequences, including automatic removal from the United States. Removal and other immigration consequences are the subject of a separate proceeding, however, and the Defendant understands that no one, including the Defendant's attorney or the Court, can predict with certainty the effect of a conviction on immigration status. The Defendant is not relying on any promise or belief about the immigration consequences of pleading guilty. The Defendant nevertheless affirms that the Defendant wants to plead guilty regardless of any potential immigration consequences.

## Advisory Sentencing Guidelines Apply

5. The Defendant understands that the Court will determine a sentencing guidelines range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. § 3551-3742 (excepting 18 U.S.C. § 3553(b)(1) and 3742(e)) and 28 U.S.C. §§ 991 through 998. The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

## Factual and Advisory Guidelines Stipulation

6. This Office and the Defendant stipulate and agree to the Statement of Facts set forth in Attachment A, which is incorporated by reference herein. This Office and the Defendant further agree that the applicable advisory guidelines apply as follows:

   a. The base offense level is **7**, pursuant to United States Sentencing Guidelines ("U.S.S.G.") § 2B1.1(a)(1).

   b. A **16**-level increase applies, pursuant to U.S.S.G. § 2B1.1(b)(1)(I), because the amount of loss involved in the offense was more than $1,500,000 but not more than $3,500,000.

   c. A **2**-level increase applies, pursuant to U.S.S.G. § 2B1.1(b)(2)(A), because the offense involved 10 or more victims.

   d. A **2**-level increase applies, pursuant to U.S.S.G. § 2B1.1(b)(3), because the offense involved theft from another person.

   e. A **2**-level increase applies, pursuant to U.S.S.G. § 2B1.1(b)(10), because the offense involved sophisticated means.

   f. A **2**-level increase applies, pursuant to U.S.S.G. § 2B1.1(b)(11), because the offense involved the unauthorized transfer or use of means of identification unlawfully to produce or obtain other means of identification, as well as the possession of 5 or more means of identification that unlawfully were produced from, or obtained by the use of, another means of identification.

    g. This Office does not oppose a **2**-level reduction in the Defendant's adjusted offense level pursuant to U.S.S.G. § 3E1.1(a) based upon the Defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for the Defendant's criminal conduct. This Office agrees to make a motion pursuant to U.S.S.G. § 3E1.1(b) for an additional **1**-level decrease in recognition of the Defendant's timely notification of the Defendant's intention to enter a plea of guilty. This Office may oppose any adjustment for acceptance of responsibility under U.S.S.G. § 3E1.1(a), and may decline to make a motion pursuant to U.S.S.G. § 3E1.1(b), if the Defendant: (i) fails to admit each and every item in the factual stipulation; (ii) denies involvement in the offense; (iii) gives conflicting statements about the Defendant's involvement in the offense; (iv) is untruthful with the Court, this Office, or the United States Probation Office; (v) obstructs or attempts to obstruct justice prior to sentencing; (vi) engages in any criminal conduct between the date of this Agreement and the date of sentencing; (vii) attempts to withdraw the plea of guilty; or (viii) violates this Agreement in any way.

    7. There is no agreement as to the Defendant's criminal history and the Defendant understands that the Defendant's criminal history could alter the Defendant's offense level. Specifically, the Defendant understands that the Defendant's criminal history could alter the final offense level if the Defendant is determined to be a career offender or if the instant offense was a part of a pattern of criminal conduct from which the Defendant derived a substantial portion of the Defendant's income.

    8. Other than as set forth above, no other offense characteristics, sentencing guidelines factors, potential departures or adjustments set forth in the United States Sentencing Guidelines are in dispute or will be raised in calculating the advisory guidelines range.

## Obligations of the Parties

    9. At the time of sentencing, this Office and the Defendant reserve the right to advocate for a reasonable sentence, period of supervised release, and/or fine considering any appropriate factors under 18 U.S.C. § 3553(a). This Office and the Defendant reserve the right to bring to the Court's attention all information with respect to the Defendant's background, character, and conduct that this Office or the Defendant deem relevant to sentencing, including the conduct that is the subject of any counts of the Indictment.

## Waiver of Appeal

    10. In exchange for the concessions made by this Office and the Defendant in this Agreement, this Office and the Defendant waive their rights to appeal as follows:

    g. The Defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291 or any other statute or constitutional provision, to appeal the Defendant's conviction on any ground whatsoever. This includes a waiver of all right to appeal the Defendant's conviction on the ground that the statutes to which the Defendant is pleading guilty is unconstitutional, or on the ground that the admitted conduct does not fall within the scope of the statutes, to the extent that such challenges legally can be waived.

h. The Defendant and this Office knowingly and expressly waive all rights conferred by 18 U.S.C. § 3742 to appeal whatever sentence is imposed (including any term of imprisonment, fine, term of supervised release, or order of restitution) for any reason (including the establishment of the advisory sentencing guidelines range, the determination of the Defendant's criminal history, the weighing of the sentencing factors, and any constitutional challenges to the calculation and imposition of any term of imprisonment, fine, order of forfeiture, order of restitution, and term or condition of supervised release), except as follows:

   i. The Defendant reserves the right to appeal any term of imprisonment to the extent that it exceeds any sentence within the advisory guidelines range resulting from an offense level of **28**; and

   ii. This Office reserves the right to appeal any term of imprisonment to the extent that it is below any sentence within the advisory guidelines range resulting from an offense level of **28**.

   i. The Defendant waives any and all rights under the Freedom of Information Act relating to the investigation and prosecution of the above-captioned matter and agrees not to file any request for documents from this Office or any investigating agency.

Forfeiture

11. The Defendant understands that the Court may enter an Order of Forfeiture as part of the Defendant's sentence, and that the Order of Forfeiture may include assets directly traceable to the offenses, substitute assets, and/or a money judgment equal to the value of the property derived from, or otherwise involved in, the offenses.

12. Specifically, but without limitation on the Government's right to forfeit all property subject to forfeiture as permitted by law, the Defendant agrees to forfeit to the United States all of the Defendant's right, title, and interest in the following items that the Defendant agrees constitute money, property, and/or assets derived from or obtained by the Defendant as a result of, or used to facilitate the commission of, the Defendant's illegal activities: a money judgment of at least **$24,244 in U.S. currency**.

13. The Defendant agrees to consent to the entry of orders of forfeiture for the property described herein and waives the requirements of Federal Rules of Criminal Procedure 32.2 and 43(a) regarding notice of the forfeiture in the charging instrument, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment. This Office agrees to seek the Attorney General's approval to apply forfeited assets to the Defendant's Restitution Order.

14. The Defendant agrees to assist fully in the forfeiture of the property described above. The Defendant agrees to disclose all assets and sources of income, to consent to all requests for access to information related to assets and income, and to take all steps necessary to pass clear title to the forfeited assets to the United States, including executing all documents necessary to transfer such title, assisting in bringing any assets located outside of the United States within the

jurisdiction of the United States, and taking whatever steps are necessary to ensure that assets subject to forfeiture are made available for forfeiture.

15. The Defendant waives all challenges to any forfeiture carried out in accordance with this Agreement on any grounds, including any and all constitutional, legal, equitable, statutory, or administrative grounds brought by any means, including through direct appeal, habeas corpus petition, or civil complaint. The Defendant will not challenge or seek review of any civil or administrative forfeiture of any property subject to forfeiture under this Agreement, and will not assist any third party with any challenge or review or any petition for remission of forfeiture.

Restitution

16. The Defendant agrees to the entry of a Restitution Order for the full amount of the victims' losses, which the parties stipulate is at least **$32,090.61 in U.S. currency**, to be joint and several with co-defendant Michael Packer. The Defendant agrees that, pursuant to 18 U.S.C. §§ 3663 and 3663A and §§ 3563(b)(2) and 3583(d), the Court may order restitution of the full amount of the actual, total loss caused by the offense conduct set forth in the factual stipulation. The Defendant further agrees that she will fully disclose to the probation officer and to the Court, subject to the penalty of perjury, all information, including but not limited to copies of all relevant bank and financial records, regarding the current location and prior disposition of all funds obtained as a result of the criminal conduct set forth in the factual stipulation. The Defendant further agrees to take all reasonable steps to retrieve or repatriate any such funds and to make them available for restitution. If the Defendant does not fulfill this provision, it will be considered a material breach of this plea agreement, and this Office may seek to be relieved of its obligations under this agreement.

Defendant's Conduct Prior to Sentencing and Breach

17. Between now and the date of the sentencing, the Defendant will not engage in conduct that constitutes obstruction of justice under U.S.S.G. § 3C1.1; will not violate any federal, state, or local law; will acknowledge guilt to the probation officer and the Court; will be truthful in any statement to the Court, this Office, law enforcement agents, and probation officers; will cooperate in the preparation of the presentence report; and will not move to withdraw from the plea of guilty or from this Agreement.

18. If the Defendant engages in conduct prior to sentencing that violates the above paragraph of this Agreement, and the Court finds a violation by a preponderance of the evidence, then: (i) this Office will be free from its obligations under this Agreement; (ii) this Office may make sentencing arguments and recommendations different from those set out in this Agreement, even if the Agreement was reached pursuant to Rule 11(c)(1)(C); and (iii) in any criminal or civil proceeding, this Office will be free to use against the Defendant all statements made by the Defendant and any of the information or materials provided by the Defendant, including statements, information, and materials provided pursuant to this Agreement, and statements made during proceedings before the Court pursuant to Rule 11 of the Federal Rules of Criminal Procedure. A determination that this Office is released from its obligations under this Agreement will not permit the Defendant to withdraw the guilty plea. The Defendant acknowledges that the

Defendant may not withdraw the Defendant's guilty plea—even if made pursuant to Rule 11(c)(1)(C)—if the Court finds that the Defendant breached the Agreement. In that event, neither the Court nor the Government will be bound by the specific sentence or sentencing range agreed and stipulated to herein pursuant to Rule 11(c)(1)(C).

### Court Not a Party

19.     The Court is not a party to this Agreement. The sentence to be imposed is within the sole discretion of the Court. The Court is not bound by the Sentencing Guidelines stipulation in this Agreement. The Court will determine the facts relevant to sentencing. The Court is not required to accept any recommendation or stipulation of the parties. The Court has the power to impose a sentence up to the maximum penalty allowed by law. If the Court makes sentencing findings different from those stipulated in this Agreement, or if the Court imposes any sentence up to the maximum allowed by statute, the Defendant will remain bound to fulfill all of the obligations under this Agreement. Neither the prosecutor, defense counsel, nor the Court can make a binding prediction, promise, or representation as to what guidelines range or sentence the Defendant will receive. The Defendant agrees that no one has made such a binding prediction or promise.

### Entire Agreement

20.     This letter, together with the Sealed Supplement, constitutes the complete plea agreement in this case. This letter, together with the Sealed Supplement, supersedes any prior understandings, promises, or conditions between this Office and the Defendant. There are no other agreements, promises, undertakings, or understandings between the Defendant and this Office other than those set forth in this letter and the Sealed Supplement. No changes to this Agreement will be effective unless in writing, signed by all parties and approved by the Court.

If the Defendant fully accepts each and every term and condition of this Agreement, please sign and have the Defendant sign the original and return it to me promptly.

Very truly yours,

Jonathan F. Lenzner
Acting United States Attorney

*Jennifer Wine* (signature)

Jennifer L. Wine
Assistant United States Attorney

Jessica C. Harvey
Special Assistant United States Attorney

Rev. August 2018

I have read this Agreement, including the Sealed Supplement, and carefully reviewed every part of it with my attorney. I understand it and I voluntarily agree to it. Specifically, I have reviewed the Factual and Advisory Guidelines Stipulation with my attorney and I do not wish to change any part of it. I am completely satisfied with the representation of my attorney.

8/25/21
Date

Rodney Jerrod Jefferson

I am the Defendant's attorney. I have carefully reviewed every part of this Agreement, including the Sealed Supplement with the Defendant. The Defendant advises me that the Defendant understands and accepts its terms. To my knowledge, the Defendant's decision to enter into this Agreement is an informed and voluntary one.

8/25/21
Date

John McKenna, Esq.

**ATTACHMENT A
STIPULATION OF FACTS**

*The undersigned parties stipulate and agree that if this case had proceeded to trial, this Office would have proven the following facts beyond a reasonable doubt. The undersigned parties also stipulate and agree that the following facts do not encompass all of the evidence that would have been presented had this matter proceeded to trial.*

Between May 2018 and August 2019, in the District of Maryland and elsewhere, the Defendant, **RODNEY JERROD JEFFERSON** ("**JEFFERSON**"), knowingly combined, conspired, confederated, and agreed with others, including **Michael Deandre Packer** ("**Packer**"), to execute a scheme and artifice to defraud Bank of America ("BOA"), Navy Federal Credit Union ("NFCU"), SunTrust Bank ("SunTrust"), Wells Fargo Bank ("Wells Fargo") (collectively "the victim financial institutions"), and to obtain and attempt to obtain money, funds, credits, assets, and securities owned by and under the custody and control of the victim financial institutions by means of materially false and fraudulent pretenses, representations, and promises (the "scheme to defraud"), in violation of 18 U.S.C. §§ 1344 and 1349.

During the conspiracy, **JEFFERSON**, **Packer**, and their coconspirators obtained arrow keys (which are unique keys used to open U.S. Postal Service collection boxes) robbed from postal carriers, used arrow keys to steal over 1,000 checks from U.S. Postal Service collection boxes, cashed the stolen checks, at times negotiated the stolen checks into fraudulent bank accounts, laundered the fraudulent proceeds, and acquired stolen cars.

On October 14, 2018, **Packer** robbed a postal worker of her arrow key, which had the series and serial number 412-3664, near Lord Dunbore Place in Upper Marlboro, Maryland. Prior to the robbery, the carrier saw **Packer** sitting alone in a black Infiniti. On January 4, 2019, the carrier positively identified **Packer** out of a photographic lineup and said that she was struck by fear when she saw his picture. On May 7, 2019, investigators went to Business 1, where they were provided with paperwork showing that Alias 1 purchased a 2008 Infiniti G37 on October 13, 2019, the day before the October 14, 2018 arrow key robbery. The documents showed that Alias 1 used a $9,401 check to make the purchase. Business 1 deposited the check into its SunTrust account, but the check was returned as altered or fictitious. Business 1 made a copy of Alias 1's driver's license at the time of the purchase and provided that copy to the investigators. The driver's license contained **Packer's** photograph and the address on the driver's license was **Packer's** address with a single altered digit.

On November 9, 2018, a man approached a postal carrier, demanded the carrier's arrow key, and said that he did not want to shoot the carrier. The carrier saw a gun on the individual who committed the robbery. The subject then fled to a white Jeep Wrangler, which was photographed driving away from the scene. Approximately 90 minutes later, Individual 4 texted **Packer** a photograph of arrows keys and said "now I got it all." That same individual had sent **Packer** photographs of a white Jeep Wrangler that matched the description of the vehicle used during the November 9, 2018 arrow key robbery.

Rev. August 2018

On December 14, 2018, **Packer** was stopped in a stolen Audi A7. The owner of the vehicle sold the Audi to **Packer** in exchange for a $25,000 check that was later returned as fictitious. **Packer** was in the driver's seat, and in the car, officers found 119 stolen checks worth $102,260, the arrow key that was stolen during the October 14, 2018 robbery (series and serial number 412-3664), a second stolen arrow key, stolen mail, 130 grams of marijuana, and **Packer**'s cell phone. On **Packer**'s phone, investigators found conversations with **JEFFERSON** about negotiating stolen checks, conversations where **Packer** negotiated the purchase of firearms, and photographs of firearms. **Packer** intended to fraudulently cash or negotiate the 119 stolen checks seized from the stolen Audi.

On January 4, 2019, **Packer** was recorded on a security camera breaking into the postal collection box at the North College Park Post Office and removing the mail. **Packer** stole approximately 435 paychecks from Victim Government Entity 1. Nine of those payroll checks, which were worth $84,696, were fraudulently cashed or negotiated before Victim Government Entity 1 could void the checks. Five days later, investigators found stolen mail, which included unopened envelopes from Victim Government Entity 1 that had been stolen from the North College Park Post Office, outside of **Packer**'s apartment building in Washington, DC ("**Packer**'s residence").

On March 13, 2019, two individuals, one of whom was **Packer**, driving a red Chevrolet Camaro with dark tinted windows and distinctive black stripes on the hood ("the Camaro"), again broke into a collection box at the North College Park Post Office and stole mail. That month, investigators saw the Camaro parked outside **Packer**'s residence, investigators saw **Packer** driving the Camaro, and **Packer** was recorded on video at the MGM National Harbor casino driving the Camaro.

On April 24, 2019, investigators executed a federal warrant on **Packer**'s residence in Washington, DC, and found over 1,000 stolen checks worth in excess of $1.5 million, a stolen arrow key, fraudulent drivers licenses displaying **Packer**'s photograph, fraudulent debit cards that matched names on the fraudulent drivers licenses, and **Packer**'s phone. Investigators also found 45 checks and an X-Acto knife on **Packer**'s person, and stolen checks and tax documents in the Camaro, which was parked outside the apartment. On **Packer**'s phone, investigators found more conversations and photographs about the purchase of firearms. **Packer** intended to fraudulently cash or negotiate the stolen checks seized from his residence.

**JEFFERSON** obtained six arrow keys that had been robbed from a postal carrier in Washington, DC on January 31, 2019. On February 27, 2019, investigators executed a search warrant on **JEFFERSON**'s residence and found the six stolen arrow keys, checks from different states and deposit receipts that were not in **JEFFERSON**'s name, credit cards that were not in **JEFFERSON**'s name, and a magnetic stripe reader used for encoding credit cards. The issuers of the stolen checks reported to investigators that they deposited the checks into U.S. Postal Service collection boxes, but that the checks were never delivered.

On June 18, 2019, investigators followed **JEFFERSON** to the 9400 block of Lanham Severn Road in Seabrook, Maryland in a stolen Cadillac CTS. **JEFFERSON** noticed the investigators and fled on foot from the Cadillac, though he was apprehended moments later. In the

stolen car, investigators found approximately 160 stolen personal checks that were in various stages of alteration, multiple credit cards in different names, a credit card embosser, and a loaded Tec-9 handgun.

On August 5, 2019, **JEFFERSON** used a white Ford F-250 ("the truck") to steal mail from the collection boxes at the Kingstone Post Office in Alexandria, Virginia. The truck was rented to **JEFFERSON**, who was on video picking up the truck from Enterprise. Three days later, **JEFFERSON** was stopped in the truck. In the truck, officers found debit and electronic payment cards in names other than **JEFFERSON**'s, stolen and altered checks, an ATM deposit receipt matching the name of one of the debit cards **JEFFERSON** possessed in the truck, and a fraudulent Connecticut driver's license displaying **JEFFERSON**'s photograph.

During the course of the conspiracy, **Packer** and **JEFFERSON** were recorded on bank surveillance video cashing and negotiating fraudulent checks that were stolen from the mail, and withdrawing the fraudulent proceeds. For instance, **Packer** and **JEFFERSON** were recorded on bank surveillance video conducting the following fraudulent transactions.

- On July 10, 2018, **JEFFERSON** negotiated a $7,000 check (Check 12110) that had been stolen from Individual 19 at a SunTrust ATM in Largo, Maryland.

- On July 24, 2018, **JEFFERSON** negotiated an $8,791 check (Check 8844) that had been stolen from Victim Company 2 at a SunTrust ATM in McLean, Virginia.

- On November 29, 2018, **Packer** negotiated an $875 check (Check 23274) that had been stolen from Victim Company 3 at a SunTrust branch in Washington, DC. **Packer** altered the stolen check to make it payable to "**MICHAEL Packer**."

- On February 21, 2019, **JEFFERSON** deposited a $5,249 check that had been stolen from Individual 10 at an NFCU ATM in Glenarden, Maryland. **JEFFERSON** deposited that check into an account opened in the name of Individual 11 ("the Individual 11 account").

- On February 26, 2019, **JEFFERSON** used the debit card associated with Individual 11's account ("the Individual 11 debit card") to purchase U.S. Postal Service money orders in the amount of $1,603 at the Landover Post Office in Landover, Maryland. The same day, **JEFFERSON** was recorded using the Individual 11 debit card to make a $600 cash withdrawal.

- On February 26, 2019, **JEFFERSON** purchased additional money orders in the amount of $1,001, this time from the College Park (Maryland) Post Office, using the Individual 11 debit card.

- On May 28, 2019, **JEFFERSON** attempted to make a fraudulent $6,059 deposit into an NFCU account held in the name of Individual 20 at an NFCU ATM in Largo, Maryland.

In total, **JEFFERSON** obtained at least $24,244.00 in proceeds as a result of the conspiracy.

The victim financial institutions were financial institutions within the meaning of 18 U.S.C. § 20 and had their deposits insured by the Federal Deposit Insurance Corporation and the National Credit Union Administration. At least 10 entities and individuals—i.e., financial institutions, the U.S. Postal Service, and the issuers and payees of the checks **JEFFERSON** stole—were victims of **JEFFERSON**'s bank fraud scheme. Because **JEFFERSON** altered and negotiated stolen checks, and at times used aliases, **JEFFERSON** used sophisticated means to execute the bank fraud scheme. **JEFFERSON** intended to fraudulently cash and negotiate the checks that he and his coconspirators stole from the mail, and therefore intended to obtain between $1.5 million and $3.5 million through the bank fraud scheme. **JEFFERSON** and his coconspirators caused an actual loss to the victims of at least ~~$150,275.39~~ $32,090.61 [handwritten initials]

SO STIPULATED:

_____
Jennifer L. Wine
Assistant United States Attorney

Jessica C. Harvey
Special Assistant United States Attorney

_____
Rodney Jerrod Jefferson
Defendant

_____
John McKenna, Esq.
Counsel for Defendant