IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | CRIMINAL NO. TDC-20-276 |
| | * | |
| RODNEY JERROD JEFFERSON, | * | |
| | * | |
| Defendant | * | |
| | * | |

\*\*\*\*\*\*\*

## GOVERNMENT'S SENTENCING MEMORANDUM

Defendant Rodney Jerrod Jefferson is scheduled to be sentenced on November 15, 2021, at 2:00 p.m. The United States of America, by and through its attorneys, hereby submits this memorandum in aid of sentencing. For the reasons described herein, the United States recommends that the Court sentence the Defendant to a term of imprisonment of 136 months, followed by five years of supervised release.

**I.  Procedural Background and Plea Agreement**

On August 26, 2020, the Defendant was charged in a one-count indictment with Conspiracy to Commit Bank Fraud, in violation of 18 U.S.C. § 1349. ECF No. 7. Pursuant to a written plea agreement (the "Plea Agreement"), on August 26, 2021, the Defendant appeared before this Court and pleaded guilty to the sole count of the indictment, which carries a maximum statutory sentence of thirty years' imprisonment, five years' supervised release, and a $1,000,000 fine. ECF Nos. 67, 70. The United States agrees with the recitation of the offense conduct as stated in the Presentence Investigation Report ("PSR"). *See* PSR at ¶¶ 7-28.

**II.  Sentencing Recommendation**

   **A.  Calculation of the Sentencing Guidelines**

The Government agrees with the U.S. Probation Office's calculation of the advisory U.S.

Sentencing Guidelines ("Guidelines" or "U.S.S.G.") calculations reflected in the PSR at ¶¶ 32-42:

| | |
|---|---|
| Base Offense Level [§ 2B1.1(a)(1)] | 7 |
| Loss between $1,500,000 and $3,500,000 [§ 2B1.1(b)(2)(A)] | +16 |
| Offense involving ten or more victims [§ 2B1.1(b)(2)(A)(i)] | +2 |
| Offense involving theft from the person of another [§ 3B1.3] | +2 |
| Offense involving sophisticated means [§ 2B1.1(b)(10)] | +2 |
| Use of means of identification of others [§2B1.1(b)(11)(C)(i), (ii)] | +2 |
| Acceptance of Responsibility [§ 3E1.1(a)] | -2 |
| Government Motion [§ 3E1.1(b)] | -1 |
| Total Adjusted Offense Level | 28 |

Criminal History Score: 12
Criminal History Category: V
[U.S.S.G. §§ 4A and 5A]

*Guideline Range: 130 to 162 months' imprisonment*

## III. Applicable Law

In *United States v. Booker*, the Supreme Court rendered the Sentencing Guidelines advisory. 543 U.S. 220, 260 (2005); *see also Kimbrough v. United States*, 552 U.S. 85, 90 (2007) ("[T]he Guidelines, formerly mandatory, now serve as one factor among several courts must consider in determining an appropriate sentence"). *Booker* and its progeny instruct that a district court must "impose a sentence sufficient, but not greater than necessary" to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; to afford adequate deterrence; to protect the public; and to provide the defendant with necessary correctional treatment. The court should also consider the nature and circumstances of the offense and the history and characteristics of the defendant; the kinds of sentences available; the kinds of sentences and the sentencing range established by the Guidelines; any pertinent policy statement; the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and the need to provide restitution to any victims of the offense. 18 U.SC. § 3553(a)(1)-(7).

The sentencing court is to begin by determining the applicable Guidelines range, looking to the Guidelines as "the 'starting point and the initial benchmark.'" *Kimbrough*, 552 U.S. at 108 (quoting *Gall v. United States*, 552 U.S. 38, 49 (2007)). After allowing the parties to argue for a sentence they deem appropriate, the court should consider the § 3553(a) factors to determine if they support the sentence suggested by the parties. *Gall*, 552 U.S. at 49-50. *Gall* further directs that should the sentencing court vary from the Guidelines, it "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Id.* (noting that "a major departure should be supported by a more significant justification than a minor one").

## IV. Discussion

### A. A Guideline Sentencing of Imprisonment is Warranted.

18 U.S.C. §3553(a) identifies the factors that must be considered when imposing a sentence. The Court should consider the following factors in crafting the sentence:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;
(2) the need for the sentence imposed –
 (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
 (B) to afford adequate deterrence to criminal conduct; . . .
(3) the kinds of sentences available;
(4) the kinds of sentence and the sentencing range established for –
 (A) the applicable category of offense committed by the applicable category of defendant as set forth in the [U.S. Sentencing G]uidelines . . .
(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct . . . .

*Id.* Applying these factors here, a sentence of sixty-three months' imprisonment is sufficient to satisfy the goals of sentencing.

3

A within-Guidelines sentence reflects the accumulated wisdom and expertise of the Sentencing Commission, serving the essential goal of uniformity and fairness in sentencing. Though the Guidelines are no longer mandatory, "the Commission fills an important institutional role: It has the capacity courts lack to base its determinations on empirical data and national expertise, guided by a professional staff with appropriate expertise." *Kimbrough*, 552 U.S. at 108-09 (internal quotation marks and citation omitted). Consequently, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Id.* (quoting *Rita v. United States*, 551 U.S. 338, 350 (2007)).

The Guidelines represent the sole means to assure some measure of uniformity in sentencing, fulfilling a key goal of the Sentencing Reform Act of 1984. Reference to the Guidelines, while carefully considering the § 3553(a) factors, is the only available means of preventing sentences based on the luck of the draw in judicial assignments. Accordingly, "district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process." *Gall*, 552 U.S. at 50 n.6.

The Guidelines merit significant respect. A district court has discretion to vary from an advisory range, subject only to deferential appellate review for reasonableness. Nonetheless, a district court must consider the Guidelines range, *see* § 3553(a)(4), and is generally well-advised to follow the Sentencing Commission's advice in order to assure fair, proportionate, and uniform sentencing.

**B.      Relevant Sentencing Considerations Pursuant to 18 U.S.C. § 3553(a)**

The Defendant's extensive participation in this criminal conspiracy demands a term of imprisonment within the Guidelines range. Moreover, his criminal history and the instant investigation both indicate two particularly troubling themes: fraudulent activity and the presence

of dangerous weapons. Over the course of nearly a decade, the Defendant has time and again demonstrated his inveterate proclivities toward theft and guns. A high-end sentence is necessary to satisfy the goals of sentencing.

### i. The Serious Nature and Circumstances of the Offense

The Defendant's fraud scheme was grounded upon layer after layer of theft. As admitted in the stipulated facts, the Defendant and his coconspirators robbed U.S. Postal Service carriers of their arrow keys, broke into U.S. Mail collection boxes, and stole over one thousand checks. They then cashed the stolen checks, sometimes using fraudulent bank accounts and laundered the money they obtained. In so doing, they sparked fear among the individuals they victimized, threatened a loss of over $1.5 million, and undermined the public trust in the U.S. Postal Service.

Although fraud is not a violent crime, it is certainly not victimless. To be sure, the coconspirators' fraud scheme was lucrative, resulting in an actual loss of $35,100.17; the Defendant himself personally obtained proceeds in excess of $18,000. But these sums fail to quantify the personal impact on the conspiracy's victims, including the U.S. Postal carrier who the Defendant's co-defendant, Michael Packer, robbed on October 14, 2018. As set forth in the stipulated facts, when confronted with Packer's photographic in a lineup months after the robbery, the assaulted U.S. Postal carrier remained struck by fear.[1]

The Defendant, too, benefitted from the U.S. Postal carrier robberies and admitted as part of his plea agreement that he obtained six arrow keys that had been robbed from a postal carrier in Washington, D.C. on January 31, 2019 all of which were recovered from the Defendant's residence

---

[1] Other coconspirators employed similar tactics, threatening postal carriers with physical harm to intimidate them into complying. As admitted in the stipulated facts, in November 2018, an individual bearing a visible gun approached a postal carrier and demanded his arrow key, warning that he did not want to shoot the carrier. Less than two hours later, the same individual texted Michael Packer a photograph of the arrow key and boasted, "[N]ow I got it all."

5

less than a month later during the execution of a February 27, 2019, search warrant.[2]  Investigators also found deposit receipts and credit cards that were not in the Defendant's name, a magnetic stripe reader used to encode credit cards, and stolen and undelivered checks issued by victims who had deposited them into U.S. Postal Service collection boxes.

On June 18, 2019, investigators followed the Defendant as he was driving a stolen Cadillac CTS to the 9400 block of Lanham Severn Road in Seabrook, Maryland.  When the Defendant noticed them, he fled from on foot the car and was apprehended moments later.  Inside the stolen Cadillac, investigators found approximately 160 stolen personal checks in various stages of alteration, multiple credit cards in different names, a credit-card embosser, and a loaded Tec-9 handgun.

On August 5, 2019, the Defendant used a rented Ford F-250 truck to steal mail from the collection boxes at the Kingstowne Post Office in Alexandria, Virginia.  Three days later, officers stopped the Defendant in the truck used in the theft and  found debit and electronic payment cards in names other than the Defendant's, stolen and altered checks, an ATM deposit receipt matching the name of one of the debit cards in the truck, and a fraudulent Connecticut driver's license displaying the Defendant's photograph.

As part of his written plea agreement, the Defendant admitted to personally conducting numerous fraudulent transactions in furtherance of the conspiracy, many of which were captured on surveillance footage.  For example, on July 10, 2018, the Defendant negotiated a $7,000 check stolen from Individual 19 at a SunTrust ATM in Largo, Maryland.  Later that month, the Defendant negotiated a $8,791 check stolen from Victim Company 2 at a SunTrust ATM in McLean, Virginia.

---

[2] The details of the January 31, 2019 U.S. Postal carrier robbery are included in the U.S. Postal Inspection Service Memorandum of Interview with the victim postal carrier attached hereto as Exhibit 1.  The suspect ribbed the six USPS arrow keys from a leather holder attached to the postal carrier's belt.

On February 21, 2019, the Defendant deposited a $5,249 check stolen from Victim 10 at a Navy Federal Credit Union ATM in Glenarden, Maryland intoan account opened in the name of Individual 11. Less than a week later, on February 26, 2019, the Defendant used the debit card associated with Individual 11's bank account to make a $600 cash withdrawal and to purchase $1,603 in money orders from the Landover, Maryland Post Office. The Defendant also purchased $1,001 in money orders from the College Park Post Office on the same day, again using the debit card linked to Individual 11's account.[3]  Finally, on May 28, 2019, the Defendant attempted to make a fraudulent $6,059 deposit into a Navy Federal Credit Union account in the name of Individual 20 at a Largo, Maryland ATM.  All told, the Defendant successfully obtained at least $18,023.67 in proceeds from the conspiracy.

      The Government notes that the loss amount is based upon the intended loss of over $1.5 million, pursuant to U.S.S.G. § 2B.1.  In the stipulated facts, the Defendant admitted that he intended to fraudulently cash or negotiate the checks that he and his coconspirators stole, totaling more than $1.5 million.  The Guidelines Commentary directs that the greater of intended or actual loss is to be used to calculate the offense level.  Section 2B1.1 n.3(A).  "Intended loss" refers to "the pecuniary harm that the defendant purposefully sought to inflict"—here, the value of both the negotiated and unnegotiated checks.  U.S.S.G. § 2B1.1 n.3(A)(ii); *see United States v. Anderson*, 286 F. App'x 654, 658 (11th Cir. 2008) (including unnegotiated checks in calculation of intended pecuniary loss for Guidelines purposes).

      In addition, pursuant to U.S.S.G. § 2B1.1(b)(2)(A), two levels are added to an offense that "involved 10 or more victims." A "victim" includes any person, corporation, and company who

---

[3] As set forth in the Consent Motion for a Preliminary Order of Forfeiture (ECF No. 88), during February 27, 2019 execution of the search warrant at the Defendant's residence in Upper Marlboro, Maryland, law enforcement recovered two U.S. Postal Service money orders totaling $1,600.

"sustained any part of the actual loss determined under [§ 2B1.1](b)(1).]" U.S.S.G. § 2B1.1 n.1. According to the plea agreement and the PSR, the victims include the impacted financial institutions, the U.S. Postal Service, and the issuers and payees of the stolen checks. U.S.S.G. § 2B1.1 n.4(C)(i). The Defendant and his coconspirators stole over one thousand pieces of mail. In addition to the checks discussed above, other stolen items included correspondence to or from local courts, the Social Security Administration, state unemployment offices, and utility services; money orders; tax payments to be delivered to the Internal Revenue Service; various business and insurance documents; and personal correspondence.

Even those victims who experienced no direct loss suffered inconvenience, uncertainty, and anxiety, as reflected in the victim impact statements attached hereto as Exhibit 2. As one victim explained, the Defendant's offense "has affected my confidence and feeling of security to drop mails, especially check payments, in my own mailbox. *See* Ex. 1 at 6. I drive out to drop off mails miles away in post offices and that takes time, effort [and] gas money." Another victim stated, "I never put mail in any mailbox now . . . I just assume that by using an outdoor mailbox I'm putting myself at risk." *See* Ex. 1 at 10.

Additionally, the Defendant's conduct sowed distrust in the the U.S. Postal Service—an institution fundamental to the functioning of the U.S. government—at a time when public trust in government is already diminished. Victims explained: "I distrust the postal system and the people walking or driving past my mailbox, especially at night" (including "postal personnel") and "these events seriously compromised the reputation of the USPS and made me wonder about the reliability/deterioration of our country's mail service." *See* Ex. 1 at 5-7. Given the gravity of the offense and the societal interests affected, a significant period of incarceration is warranted.

Another two-level increase applies because the offense involved theft from the person of another. U.S.S.G. § 2B1.1(b)(3). The relevant commentary indicates that § 2B1.1(b)(3) applies to "theft, without the use of force, of property that was being held by another person or was within arms' reach. Examples include pick-pocketing and non-forcible purse-snatching, such as the theft of a purse from a shopping cart." U.S.S.G. § 2B1.1 cmt. n.1 (2018). Such theft "receives an enhanced sentence because of the increased risk of physical injury." *Id.* cmt. background. Courts have described this provision as "target[ing] physical and therefore potentially violent (even if non-forcible) forms of theft." *United States v. Pizarro-Berrios*, 448 F.3d 1, 11 (citing *United States v. Rizzo*, 349 F.3d 94, 98, 100 (2d Cir. 2003); *United States v. Londono*, 285 F.3d 348, 350-51, 353-54 (5th Cir. 2002); *United States v. Jankowski*, 194 F.3d 878, 885-86 (8th Cir. 1999)). As set forth above, the Defendant obtained and was in possession of six arrow keys robbed from a U.S. Postal carrier in Washington, D.C. on January 31, 2019. Additionally, as part of the conspiracy, on October 14, 2018, the Defendant's coconspirator physically confronted a U.S. Postal carrier in Upper Marlboro, Maryland and robbed her of her arrow key. This conduct falls squarely within this enhancement's terms.

Another two-level increase applies, pursuant to U.S.S.G. § 2B1.1(b)(10), because the offense involved sophisticated means. The Defendant altered and negotiated stolen checks, at times using aliases to do so. Sophisticated means "means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." U.S.S.G. § 2B1.1 cmt. n. 9(B). By way of example, the Sentencing Guidelines states that the sophisticated-means enhancement applies where the offense conduct includes "hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts.'" *Id.* "The enhancement applies where the entirety of a scheme constitutes sophisticated means, even if

9

every individual action is not sophisticated." *United States v. Adepoju*, 756 F.3d 250, 257 (4th Cir. 2014). "A sentencing court should consider the cumulative impact of the criminal conduct, for the 'total scheme' may be 'sophisticated in the way all the steps were linked together.'" *United States v. Jinwright*, 683 F.3d 471, 486 (4th Cir. 2012). "[T]he essence of the definition is merely deliberate steps taken to make the offense difficult to detect." *United States v. Stone*, 85 F. App'x 925, 938 (4th Cir. 2004) (per curiam) (unpublished) (quoting *United States v. Kontny*, 238 F.3d 815, 821 (7th Cir. 2001)). The Defendant used stolen arrow keys to access U.S. Postal collection boxes, possessed altered checks, and used fraudulent debit cards, all in an effort to conceal his crimes. He and his coconspirators also utilized multiple bank accounts in the names of other individuals and companies in furtherance of their scheme, further obscuring it from detection.

A final two-level increase applies pursuant to the Defendant's use of the means of identification of others to unlawfully produce or obtain other means of identification, as well as the possession of five or more means of identification that were unlawfully produced from, or obtained by the use of, another means of identification, pursuant to U.S.S.G. § 2B1.1(b)(11)(C)(i) and (ii). The Application Notes define "means of identification" by reference to 18 U.S.C. § 1028(d)(7), which defines the term as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific individual." By way of example, the Note describes the use of names and social security numbers to obtain a bank loan or credit card as conduct to which the Guideline applies. *See* U.S.S.G. § 2B1.1(b)(11)(C)(i) and (ii), comment. (nn. 1, 10(C)). As set forth in the plea agreement, during the February 27, 2019 search of the Defendant's residence, investigators recovered credit cards not in the Defendant's name and a magnetic stripe reader used for encoding credit cards. Four months later, on June 18, 2019, from a stolen vehicle driven by the Defendant investigators recovered multiple credit cards in different

names and a credit card embosser. Finally, on August 5, 2019, during a stop of the rented Ford F-250 truck used by the Defendant three days earlier to steal mail from U.S. Postal collection boxes in Alexandria, Virginia, investigators recovered additional debit and electronic payment cards in names other than the Defendant's and a fraudulent Connecticut driver's license displaying the Defendant's photograph. The Defendant's use of the means of identification of others is relevant conduct, and accordingly, the two-level enhancement is properly applied.

### ii. Defendant's History and Characteristics

The PSR assigns the Defendant a total criminal history score of twelve, based on numerous prior criminal convictions and the fact that he committed the instant offense while on probation for a 2017 Prince George's County conviction for illegal possession of a regulated firearm. *See* PSR ¶¶ 55-57.

As set forth in the PSR, the Defendant's criminal convictions span nearly a decade, beginning in 2012. *See* PSR ¶ 46. Of particular relevance here, the Defendant previously was convicted in Prince George's County in 2013 for theft of property between $1,000 and $10,000 involving facts nearly identical to those at issue here. In April 2012, a victim placed a personal check for $3,448.02 into his residential mailbox to pay his residential mortgage. The check was stolen from the victim's mailbox and altered to be payable to "Rodney Jefferson." Jefferson was later captured on surveillance video at the victim's credit union branch cashing the stolen and altered check. . PSR ¶ 49. The PSR further includes a 2016 Charles County conviction for opening letters without permission (PSR ¶ 51) as well as two additional misdemeanor thefts (PSR ¶¶ 46 and 48). The PSR additionally lists a "Letters – Open Without Permission" conviction from Charles County in 2016 as well as two additional .

11

The Defendant also has two prior firearms convictions including a 2012 Prince George's County conviction for transportation of a handgun on a roadway in which law enforcement officers encountered the Defendant and witnessed him "reach[] into his waistband with his left hand and grab[] what appeared to be the handle of a gun" the Defendant then turned and fled from the officers. During the chase, law enforcement witnessed the Defendant pull a silver revolver out of his waistband while continuing to run. The Defendant subsequently discarded the revolved in a backyard and was apprehended while hiding in the bushes a short distance away. The recovered firearm was loaded with six live cartridges. S*ee* PSR ¶ 47. In 2017, the Defendant was convicted in Prince George's County for illegally possessing a stolen firearm. The firearm—a loaded black Taurus 9mm handgun—was recovered during a traffic stop in a hidden compartment on the driver's side door of a black Infiniti G35 driven by the Defendant. Also located in the hidden compartment were six grams of crack cocaine and 14 grams of marijuana. *See* PSR ¶ 53.

Additionally, the Defendant has two pending cases in Prince George's County. PSR ¶¶ 79, 80. Most notable are the pending firearms charges (illegal possession of a regulated firearm, handgun in vehicle, and loaded handgun in vehicle) arising from a July 29, 2020 arrest in Capitol Heights, Maryland in which two loaded firearms (a 9mm Glock 26 semiautomatic handgun loaded with 16 rounds and one in the chamber and a black .45 caliber Glock 30s semi-automatic handgun loaded with nine rounds with one in the chamber), 64 grams of marijuana, a digital scale and clear plastic baggies were located in a vehicle. The vehicle—a dark gray Tesla Model S—had been rented by the Defendant since March 2020 and matched the description of a vehicle used in a shooting which occurred on April 27, 2020 in Seat Pleasant, Maryland. PSR ¶ 80.[4]

---

[4] In connection with the April 27, 2020 shooting, the Defendant was charged with attempted – 1st degree murder, attempted – 2nd degree murder, assault – 1st degree, as well as various firearms offenses. All of the charges were nolle prossed on March 10, 2021. PSR ¶ 78.

Given the Defendant's criminal history, including numerous firearms convictions, and prior convictions involving theft of mail, a significant sentence is necessary to provide adequate specific deterrence. Moreover, a five-year term of supervised release is appropriate to ensure that the Defendant does not reoffend and satisfies his restitution obligation.

>  iii.  **The Need for the Sentence Imposed to Reflect the Seriousness of the Offense, Promote Respect for the Law and Provide Just Punishment for the Offense, and to Afford Adequate Deterrence**

A substantial prison sentence for the Defendant is essential to accomplish the relevant purposes of § 3553(a)(2); that is: "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; [and] (B) to afford adequate deterrence to criminal conduct . . . ." 18 U.S.C. § 3553(a)(2).

With respect to the seriousness of the offense, this was not a one-off mistake or a crime of convenience: the Defendant has been convicted of a conspiracy that existed for over a year, with multiple discrete steps in which he participated intimately. Each step represented an opportunity for him to walk away. Instead, he doubled down. A Guidelines sentence addresses the seriousness of the Defendant's calculated, sustained, and largely successful scheme and provides just punishment for his offense.

Respect for the law requires a significant sentence of imprisonment in order to convey to the community that the commission of such fraud is a serious offense and will be punished appropriately. A Guidelines sentence is also necessary for purposes of general deterrence—to send the message to others who might ponder whether the financial gain from fraud is worth the risk of arrest, prosecution, and incarceration.

13

### iv.   The Need to Provide Restitution

The Defendant stipulated in his plea agreement to the entry of a restitution order in the full amount of the victims' losses which the parties stipulated was at least $32,090.61 in U.S. currency. (ECF No. 70.)  The parties' agree that actual amount of victim losses relating to the Defendant's offenses is $35,119.17 as set forth on the restitution worksheet attached hereto as Exhibit 3.

The majority of the individual victims were made whole by their financial institutions.  As such, the United States is only aware of one individual victim, Individual 21, that suffered a financial loss as a result of the Defendant's offense.  In preparation for sentencing, the United States was contacted by Individual 21 who was charged interest of $7,209.30 by the Internal Revenue Service ("IRS") when the checking covering his 2018 federal income tax payment was stolen from a U.S. Postal collection box (and subsequently recovered during the execution of the search warrant at the Defendant's residence).  See Exhibit 4.[5]  The IRS has advised Individual 21 that it is unable to waive the interest for unpaid taxes even for reasonable cause.  Id. at 9.  The United States requests that the Court's judgment direct that Individual 21 receive restitution prior to the financial institutions that provided compensation to the other victims as provided by 18 U.S.C. § 3664(j)(1).

The plea agreement contemplates the Defendant's restitution judgment being joint and several with co-defendant Michael Packer, who was sentenced by this Court on October 20, 2021 and ordered to pay restitution in the amount of $35,119.17.  (ECF Nos. 83, 85.)

---

[5] Exhibit 4 is redacted to protect Individual 21's personally identifiable information and tax information.  An unredacted version is available should the Court require one.

## V.   Statement Regarding Witnesses and Length of Hearing

The United States does not anticipate calling witnesses at the upcoming sentencing hearing. The United States anticipates that the sentencing hearing should not require more than approximately one hour.

## VI.   Conclusion

The Court's sentence should reflect that the conduct forming the basis of the Defendant's conviction was egregious, carefully planned, and deliberate. A low-end Guidelines sentence of 136 months is sufficient, but not greater than necessary, to impress upon the Defendant the seriousness of his offense, to deter future cases, and to protect the public.

For the reasons set forth herein and others as may be presented at the sentencing hearing, the Government respectfully requests that the Court sentence the Defendant to sixty-three months of imprisonment, followed by five years of supervised release. Such a sentence is reasonable, sufficient, and not greater than necessary to satisfy the goals set forth in 18 U.S.C. § 3553.

Respectfully submitted,

Erek L. Barron
United States Attorney

By: _____/s/_____
Jennifer L. Wine
Assistant United States Attorney

Jessica C. Harvey
Special Assistant United States Attorney

cc:   John McKenna, Esq., Counsel for the Defendant
      Irma Dasovic, U.S. Probation Officer

## **CERTIFICATE OF SERVICE**

   I hereby certify that on November 1, 2021, I caused the foregoing to be electronically filed with the Clerk of Court by using the CM/ECF system, which will provide notice of such filing to all counsel of record.

                   /s/
                   Jennifer L. Wine
                   Assistant United States Attorney